James P. LEHNERT, Elmer S. Junker, James Lindsey, Sam C. Peticolas, John R. Schauble, and Theodore D. Speerman, Plaintiffs–Appellants,

v.

The FERRIS FACULTY ASSOCIATION, Michigan Education Association, and National Education Association of the United States, Defendants–Appellees.

No. 87–1700.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 20, 1988.

Decided Aug. 14, 1989.

Steven L. Dykema, Mika, Meyers, Beckett & Jones, Grand Rapids, Mich., Robert H. Chanin, Bruce R. Lerner, Bredhoff & Kaiser, Washington, D.C., Arthur R. Przybylowicz, Okemos, Mich., for defendants-appellees.

Sam F. Massie, Jr., Allaben, Massie, Vander Weyden and Timmer, Grand Rapids, Mich., Raymond J. LaJeunesse (argued), Milton A. Chappell, National Right to Work Legal Defense Foundation, Springfield, Va., for plaintiffs-appellants.

Before MERRITT, MARTIN, and MILBURN, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

The plaintiffs, six faculty members at Ferris State College, appeal the judgment of the district court in this § 1983 civil rights action, claiming that the collection and use of service fees as an agency shop violated their rights under the first and fourteenth amendments. We affirm the judgment of the district court.

I.

Since 1975, the Ferris Faculty Association, an affiliate of the Michigan Education Association and the National Education Association, has been recognized under the Michigan Public Employment Relations Act, Mich.Comp.Laws § 423.211, as the exclusive bargaining representative for the faculty of Ferris State College, a four-year public institution of higher learning in Michigan. During the 1981–82 membership year, which is the only relevant year for the purposes of this appeal, the plaintiff faculty members were included in the bargaining unit represented by the Ferris Faculty Association, but did *not* become members of the Association. The collective bargaining agreement in effect during 1981–82 included a service fee provision that required all employees in the bargaining unit who did not belong to the Ferris Faculty Association to pay a service fee equivalent to the amount of dues required of members of the Association. Of the $284.00 service fee required in 1981–82, $24.80 was paid to the Ferris Faculty Association, $211.20 went to the Michigan Education Association, and $48.00 was collected by the National Education Association. Under the unified structure of the unions, membership in the Ferris Faculty Association constituted membership in the Michigan Education Association and the National Education Association as well; consequently, the mandatory service fees paid by nonmembers such as the six plaintiffs were divided among the three affiliated unions. The plaintiff faculty members objected to the use by the unions of their service fees for purposes other than negotiating and administering a collective bargaining

agreement with the Ferris Board of Control, the governing body of Ferris State College, and they filed a civil rights action under 42 U.S.C. §§ 1983, 1985 and 1986 against the Ferris Board of Control, the Ferris Faculty Association, the Michigan Education Association and the National Education Association. In their complaint, the plaintiffs alleged that the unions' use of their mandatory service fees to engage in certain activities, including lobbying and political campaigning, violated their rights under the first and fourteenth amendments.

A trial before the court was held in January and April of 1986. On August 25, 1986, the district court issued its opinion, holding that certain union expenditures were chargeable to the plaintiffs, that other expenditures were not chargeable as a matter of law, and that other expenditures were not chargeable because the unions failed to sustain their burden of proving the expenditures were made for chargeable activities. *Lehnert v. Ferris Faculty Association–MEA–NEA,* 643 F.Supp. 1306 (W.D.Mich.1986). Following a settlement agreement between the parties, this appeal is limited to the claim that the district court erred in holding that the costs of certain disputed union activities were constitutionally chargeable to the plaintiff faculty members.

## II.

Before addressing the union activities specifically objected to by plaintiffs, we begin our analysis by surveying the Supreme Court decisions that plaintiffs and defendants both agree must govern our resolution of this appeal. The Court initially addressed first amendment questions in the union shop context in a series of cases brought under the Railway Labor Act. In *Railway Employees' Dep't v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), the Court held that the Railway Labor Act, which authorized employers and labor organizations acting as exclusive representatives of bargaining units to enter into union shop agreements, did not violate the Constitution. Several years later in *International Association of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), the Court held that the Railway Labor Act did not allow a union, even in a closed shop, to expend union funds to support political causes over the objection of dissenting union members. The Court noted that political uses of funds by a union were not uses that helped defray the expenses of negotiating and administering collective agreements or the expenses of adjusting grievances and disputes. *Street,* 367 U.S. at 768, 81 S.Ct. at 1799. Similarly, in *Brotherhood of Railway and Steamship Clerks v. Allen,* 373 U.S. 113, 121, 83 S.Ct. 1158, 1163, 10 L.Ed.2d 235 (1963), the Court characterized the union expenditures that could be charged to dissenting employees as only those "germane to collective bargaining." Most recently, in *Ellis v. Brotherhood of Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984), the Court delineated the line between chargeable and nonchargeable union expenditures under the Railway Labor Act. Specifically, the Court stated that

> the test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues. Under this standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit.

466 U.S. at 448, 104 S.Ct. at 1892.

Although the Supreme Court has, as we discussed, decided several cases concerning the union shop in the private sector, the Court has considered the constitutionality of the union shop in the public sector only once. In *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Court found the same Michigan statute at issue in this case to be constitutional, thereby approving the

union or agency shop in the public sector. The Court noted, however, that the line between collective bargaining, contract administration or grievance adjustment activities, for which contributions from dissenting employees may be compelled, and ideological or political activities, for which such compulsion is prohibited, may be "somewhat hazier" in the public sector. Because the process of establishing a collective-bargaining agreement in the public sector requires not only "concord at the bargaining table, but subsequent approval by other public authorities," budgetary and appropriations decisions could be regarded as an "integral part of the bargaining process" for public employees. 431 U.S. at 236, 97 S.Ct. at 1800. In *Abood*, the Court remarked that it had "no occasion" to attempt to define the hazy dividing line between chargeable and nonchargeable union expenditures in the public sector, but we must, with guidance from *Hanson, Street, Allen, Ellis* and *Abood*, attempt to draw such a line in resolving this appeal.

### III.

The plaintiff faculty members contend on appeal that certain union activities were improperly found chargeable to them under the standards set forth in *Abood* and *Ellis*. The challenged union activities include expenditures for the costs of (1) conventions; (2) lobbying and union electoral campaigns; (3) activities on behalf of persons not employed in the plaintiffs' bargaining unit; (4) strike preparation and public relations activities; and (5) miscellaneous professional activities. We disagree with the plaintiffs' claim that the district court erred in holding these disputed expenditures to be chargeable to them.

■ The plaintiffs argue that union expenditures to send Ferris Faculty Association delegates to the Michigan Education Association and the National Education Association conventions and to participate in the 13E Coordinating Council, another union structure, should not be chargeable to them. We do not agree. In *Ellis*, the Supreme Court found that the *entire* cost of the national union's convention was chargeable to employees, even though a portion of the convention was apparently

"political" in nature. 466 U.S. at 459, 104 S.Ct. at 1898 (Powell, J., dissenting in part). The plaintiff faculty members attempt to distinguish *Ellis* on the ground that the conventions of the Michigan Education Association and the National Education Association (unlike the national convention at issue in *Ellis*) were those of affiliated parent unions rather than a convention of the actual exclusive bargaining representative of the plaintiffs. We are not convinced that this distinction amounts to more than a technical difference in union organization. In any event, the district court noted that the Michigan Employment Relations Commission, which has primary authority for construing the Michigan Public Employment Relations Act, has held that a dissenting employee may be charged for the cost of the Michigan Education Association and the National Education Association conventions under *Ellis* because the "union as affiliated is the exclusive representative." 643 F.Supp. at 1326. For these reasons, we affirm the district court's decision that, under *Ellis*, the objecting plaintiff faculty members may be fully charged for the costs of the union conventions. We affirm for similar reasons the district court's decision that funds spent by the Ferris Faculty Association to send representatives to the 13E Coordinating Council were chargeable, as the court specifically found that the Council developed bargaining strategies and representational policies for bargaining units, including Ferris State College, and the plaintiffs failed to show this finding by the district court to be clearly erroneous.

The plaintiffs also assert that union expenditures for legislative lobbying and for "millage" campaigns and other ballot issues were erroneously found chargeable to them. While it is clear, under *Street* and *Allen*, that dissenting employees in the private sector may not be charged for political or ideological union activities, we believe that the lobbying and other "political" activities of the union in this case were, as required by *Ellis*, "reasonably employed to implement or effectuate the duties" of the Ferris Faculty Association as the exclusive representative of the *public* employees at Ferris State College.

There are, as noted by the Supreme Court in *Abood*, fundamental differences between collective bargaining in the public sector and in the private sector. It cannot be disputed that governmental budgetary and appropriations decisions directly affect the terms and conditions of employment for public employees. To represent their members effectively, public sector unions must necessarily concern themselves not only with negotiations at the bargaining table but also with advancing their members' interests in legislative and other "political" arenas. We therefore agree with the opinion of the Third Circuit in *Robinson v. State of New Jersey*, 741 F.2d 598 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 366 (1985), and hold that lobbying and similar "political" activities by a public employee union that are "pertinent to the duties of the union as a bargaining representative" may be constitutionally charged to dissenting employees. 741 F.2d at 609. *Accord Knight v. Minnesota Community College Faculty Association*, 571 F.Supp. 1, 6–7 (D.Minn. 1982), *aff'd without opinion*, 460 U.S. 1048, 103 S.Ct. 1493, 75 L.Ed.2d 927 (1983) ("political" activities of the Minnesota Community College Faculty Association that were "related closely and directly to collective bargaining" were found constitutionally chargeable to objecting employees). *See also Champion v. State of California*, 738 F.2d 1082 (9th Cir.1984), *cert. denied*, 469 U.S. 1229, 105 S.Ct. 1230, 84 L.Ed.2d 367 (1985).

The district court concluded that the legislative lobbying and other political activities engaged in by the Ferris Faculty Association and its affiliated unions were sufficiently related to the unions' duties as the collective bargaining representative of the plaintiffs to be chargeable to them. The major lobbying expense held chargeable by the district court was the Preserve Public Education program of the Ferris Faculty Association. The district court found that the program "was directed at securing funding for public education in Michigan" and held the expenses of the program chargeable because such a program is "directly related" to the duties of an exclusive bargaining representative. The district

court also approved charging dissenting employees for articles relating to lobbying and similar political activities in the *Teacher's Voice*, the primary publication of the Michigan Education Association, which is available to all bargaining unit members. Despite the objections raised to these expenditures by the plaintiffs, we cannot disagree with the district court's decision.

The plaintiffs raised several objections to the district court's approval of charging dissenting employees for lobbying and other political activities of the unions. They disputed the finding of the district court that the Preserve Public Education program was a lobbying program directed at securing funds for public education in Michigan but instead contended that the program primarily involved electoral campaigns, including the contesting of ballot issues and the passing of millages. Even if the district court's finding that the Preserve Public Education program was a "lobbying" program were determined by this court to be clearly erroneous, we still believe that the costs of the program are constitutionally chargeable to dissenting employees. Contrary to the plaintiffs' contention, "political" activities by public sector unions other than legislative lobbying may be charged to dissenting employees if such activities are directly related to collective bargaining. *See Knight*, 571 F.Supp. at 5–7. The plaintiffs in their brief admit that the Preserve Public Education program involved not only lobbying but also millage and ballot campaigns *necessary to fund public education*. Because the terms and conditions of employment for the public sector employees represented by the unions in this case are obviously closely connected to the funding provided to public education, we uphold the district court's decision allowing dissenting employees to be charged for the lobbying and other "political" activities involved in the Preserve Public Education program.

Similarly, we reject the plaintiffs' contention that articles in the *Teacher's Voice* relating to lobbying and other political activities of the unions were improperly found chargeable to dissenting employees.

*Ellis* clearly held that dissenting employees may be charged for the costs of a union publication insofar as the publication reported on activities for which dissenters could be charged. 466 U.S. at 450–51, 104 S.Ct. at 1893–94. The plaintiffs assert that articles in the *Teacher's Voice* relating to general lobbying for funds for education may not be charged to them because such lobbying was not directly concerned with Ferris State College and the Ferris Faculty Association. This contention is without merit. It is unrealistic to expect a union, when lobbying a state legislature for funds for public education, to lobby for monies to support each specific institution separately. In our opinion, union lobbying to obtain funds for public education generally is sufficiently related to the unions' duties as the exclusive bargaining representative of the plaintiffs for such lobbying and for articles pertaining to such lobbying and other similar political activities to be chargeable to the plaintiffs.[1] *See Ellis,* 466 U.S. at 448–49, 104 S.Ct. at 1892–93.

■ The plaintiffs additionally object to the district court's holding that certain expenditures of the Michigan Education Association and the National Education Association were chargeable even though the expenditures were for union services provided to employees in other bargaining units, rather than for employees at Ferris State College. Our interpretation of *Ellis,* however, forces us to conclude that the plaintiffs' position is untenable. In *Ellis,* the Supreme Court held that union expenditures necessarily or reasonably incurred for the purpose of performing the duties of an exclusive bargaining representative were chargeable to dissenting employees, and the Court applied this general standard to various types of challenged union expenditures. The *Ellis* court concluded that dissenting employees could be charged for the expenses of the union's national convention, even though employees in other

bargaining units participated in and benefited from such conventions. Moreover, the Court held that dissenters could be charged for the costs of a union publication insofar as the publication reported on activities chargeable to dissenters, even if the chargeable activites reported on were *unrelated* to the specific bargaining unit of the dissenting employees. Given the Supreme Court's decision in *Ellis,* we believe that the district court did not err in finding the challenged expenditures of the Michigan Education Association and the National Education Association, which were pertinent to the unions' duties as bargaining representatives, to be chargeable to the plaintiffs. *See also Crawford v. Air Line Pilots Association International,* 870 F.2d 155 (4th Cir.1989), in which the Fourth Circuit allowed a union to use the agency fees paid by dissenting employees for expenditures outside of the dissenters' immediate bargaining unit because the expenditures in question were, as required by *Ellis,* "germane" to the union's obligation as bargaining representative.

■ The plaintiffs furthermore object to the district court's decision allowing them to be charged for union expenditures made in publicizing, preparing for and threatening a strike that would be illegal under Michigan law. Because the union did not actually engage in an illegal strike, the district court found these expenditures chargeable, and we decline to overturn the district court's decision. Based in part upon the testimony of a union witness whom the district court specifically credited, the district court found that, during the process of negotiating a new collective bargaining agreement with Ferris State College, the Ferris Faculty Association spent funds to prepare for a possible strike and to publicize the union's position so as to put pressure on Ferris. 643 F.Supp. at 1312–13. The district court reasoned that such

---

**1.** Similarly, the plaintiffs object to the district court allowing particular articles in the *Teacher's Voice,* including articles on ballot propositions involving utility rates and a nuclear weapons freeze, to be charged to them. Although the district court may have erred in permitting plaintiffs to be charged for a few particular articles, we decline to overturn the district

court's decision. It is not our task to review each and every union expenditure, no matter how minor, for conformity with the law. Because we believe that the district court correctly interpreted and applied the law to the facts of this case, we will not reverse the district court's decision on the basis of allegations of essentially *de minimis* error.

negotiation tactics and public relations activities were within the range of reasonable bargaining tools available to a public sector union during contract negotiations and therefore charged the dissenting employees for the strike preparation and public relations expenses. *See Abood*, 431 U.S. at 228, 97 S.Ct. at 1795. Because the district court's findings of fact on this issue are entitled to considerable deference, *Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985), and because we see no legal errors in the reasoning of the court, we uphold the decision to charge plaintiffs for the strike preparation and related public relations expenses.

■ Finally, the plaintiffs assert that the district court improperly charged them for other miscellaneous union expenditures, including expenditures for professional activities and for general public relations activies.[2] We believe that these miscellaneous expenditures were properly charged to plaintiffs. Public relations expenditures designed to enhance the reputation of the teaching profession and professional/educational expenditures intended to improve the profession generally and the skills of teachers specifically are, in our opinion, sufficiently related to the unions' duty to represent bargaining unit employees effectively so as to be chargeable to dissenters. In *Ellis*, the Supreme Court expressly permitted dissenting employees to be charged for union expenditures for social activities, even though such activities were "not central" to the union's function as a collective bargaining representative. 466 U.S. at 449–50, 104 S.Ct. at 1893. Although the expenditures for professional and public relations activities challenged by plaintiffs in this case may not be "central" to collective bargaining, such activities are "sufficiently related to it" to be charged to dissenting employees, 466 U.S. at 449, 104 S.Ct. at 1893, and, in any event, we, as the Court in *Ellis*, are not inclined to scrutinize such *de minimis* union expenses. 466 U.S. at 450, 104 S.Ct. at 1893.

Based upon our foregoing discussion, we affirm the decision of the district court that the challenged union expenditures are constitutionally chargeable to the plaintiffs.

The judgment of the district court is affirmed.

MERRITT, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's holding that union expenditures to send Ferris Faculty Association delegates to the Michigan Education Association and National Education Association conventions and to participate in the 13 E Coordinating Council are chargeable to the dissenting faculty members. I do not agree, however, that in a "closed shop" the First Amendment allows the teachers' union, the NEA and its Michigan subsidiaries, to exact union dues from dissenting faculty members of the College bargaining unit to support (1) union lobbying in the state legislatures; (2) union efforts in state and local elections on behalf of candidates and issues; (3) the organizing, public relations and other expenses of teacher bargaining units in schools other than Ferris College; (4) the union's expenses in preparing for illegal strikes at Ferris College which the dissenting faculty oppose and the public relations activites supporting such illegal strikes; and (5) general public relations activities at the state and national levels.

Although my brethren point to a small part of the language in *Abood* to support their conclusion that all kinds of activities not directly connected to the bargaining unit are chargeable to dissenting members of an agency shop, the entire section from *Abood* makes clear that it is the relation of the challenged activity to the bargaining unit which is crucial. *Abood*, 431 U.S. at 236, 97 S.Ct. at 1800. My brothers appear to believe that this relationship need not be a very *close* one. On the contrary, the union needs to show costs of activities which are related to the *particular* bar-

---

**2.** In their brief, the plaintiffs also object to being charged for the "international activities" of the unions. We do not address this issue be-

cause the National Education Association has made the issue moot by agreeing to refund the funds involved.

gaining unit and not undifferentiated costs of lobbying the legislature generally.

To hold otherwise is to significantly expand *Ellis* without justification and without serious attention to the protections of the First Amendment. It is true that *Ellis* expresses the very general First Amendment rule announced in *Allen* and *Abood,* requiring expenditures to be "germane to the union's duty as collective-bargaining agent." *Ellis,* 466 U.S. at 447, 104 S.Ct. at 1892. Applying the Railway Labor Act in light of First Amendment principles, however, the Court determined that Congress did not authorize the charging of expenditures that were not related to "the duties of [the Union as] an exclusive representative *of the employees* in dealing with *the employer." Id.* at 448, 104 S.Ct. at 1892 (emphasis added). The Supreme Court insisted that an expenditure must be for "activities normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative *of the employees in the bargaining unit." Id.* (emphasis added). There simply is no authority in *Ellis, Abood* or *Allen* for holding that expenses unrelated to a union's activity on behalf of employees in the plaintiffs' own shop pass constitutional muster.

Allowing the union to exact dues from dissenting non-Union members of the closed-shop bargaining unit to pay expenses unrelated to bargaining unit negotiations or grievances unjustifiably expands the holding of the Supreme Court in *Ellis.* It ignores the warning expressed in *Ellis* itself that the closed shop, which forces individuals against their will to support union activities, is already a significant infringement on freedom of expression and conscience: "But by allowing the union shop at all, we have already countenanced a significant impingement on First Amendment rights. The dissenting employee is forced to support financially an organization with whose principles and demands he may disagree." *Ellis,* 466 U.S. at 455, 104 S.Ct. at 1896.

Because the concept of the closed shop seriously affects free speech values, the Supreme Court in *Ellis* left open only a small range of "free-rider" expenses that

the dissenting member can be forced to pay. In light of First Amendment protections, those expenses must relate to the expenses of the bargaining unit itself "to defray the costs of collective bargaining, contract administration, and grievance adjustment." *Id.* at 447, 104 S.Ct. at 1892. Expenses for "the expansion of overall union power," *id.* at 451, 104 S.Ct. at 1894, may not be charged to dissenters, *id.* at 452, 104 S.Ct. at 1894. Litigation expenses not connected to the activities of the bargaining unit itself are not allowed. In dealing with litigation expenses, the Supreme Court tells us clearly where the line should be drawn:

> The expenses of litigation incident to negotiating and administering the contract or to settling grievances and disputes, arising in the bargaining unit are clearly chargeable to petitioners as a normal incident of the duties of the exclusive representative. The same is true of fair representation, litigation arising within the unit, of jurisdictional disputes with other unions, and of any other litigation before agencies or in the courts that concerns bargaining unit employees and is normally conducted by the exclusive representative. *The expenses of litigation not having such a connection with the bargaining unit are not to be charged to objecting employees.*

*Id.* at 453, 104 S.Ct. at 1895 (emphasis added).

Thus *Ellis* establishes the principle that the union expenses charged in a closed shop must relate closely to the activities of the bargaining unit of the dissenting members. The general political, lobbying, public relations and organizing activities of the NEA and its state affiliate obviously have no such relationship. The union should not be allowed to charge the dissenters with these general expenses, many of which are connected with political positions and philosophies with which the dissenters disagree. To allow the union to exact payments for lobbying, electoral campaigning and public relations forces the dissenters to support ideological positions with which they disagree. The alternative is either to submit or to lose your job. Such forced associa-

tion and coerced speech violates the First Amendment.

For example, my brothers approve the District Court's determination that certain MEA and NEA expenditures on services to other bargaining units and on the publication of general articles on labor relations in the *Teacher's Voice* are chargeable. A single common error infects both these holdings. The District Court failed to inquire which expenditures directly supported affiliate union locals in *other* bargaining units. It merely ascertained that certain expenditures were germane to the union's general role as bargaining agent for many units without asking the question whether the expenditure is directly related to the Ferris College bargaining unit. If this question had been asked, the insult to First Amendment values arising from forcing the plaintiffs to support the articles on the nuclear freeze proposal and on ballot propositions involving utility rates could not be characterized as merely *"de minimis."*

The only expenses itemized above which directly relate to the Ferris College bargaining unit's activities are the costs of preparing for a public employee strike which the parties agree would have been illegal if carried out. The dissenters were against the illegal strike. If the strike had gone forward and the house of the college president had been put to the torch, obviously the dissenters could not be charged with the gasoline for the fire. Likewise, dissenters should not be forced to pay the expenses for planning unlawful acts. To permit a closed-shop union to force dissenters to finance unlawful acts on pain of losing their jobs is no small First Amendment violation.

Accordingly, I respectfully dissent.